# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 12, 2010

No. 09-40438

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff – Appellee

v.

BRENDA DAVIS MILLER, also known as Brenda Graham Davis,

Defendant – Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before GARWOOD, SMITH, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Brenda Davis Miller pled guilty to one count of conspiracy to commit health care fraud, 18 U.S.C. §§ 1347, 1349, and one count of conducting a financial transaction with criminally derived property valued at over $10,000, *id*. § 1957. After applying sentencing enhancements for, *inter alia*, abuse of a position of trust and obstruction of justice, the district court sentenced Miller to ninety-seven months' imprisonment. We affirm the enhancement for abuse of a position of trust, vacate the enhancement for obstruction of justice, and remand for resentencing.

No. 09-40438

**FACTS AND PROCEEDINGS**

Miller was the owner of AA Better Medical Supply in Houston, Texas. She obtained licenses from Medicare and Medicaid to operate as a durable medical equipment (DME) provider, which, upon certification of medical necessity (CMN) by a licensed physician, may provide certain supplies and equipment to beneficiaries of those programs. The DME provider may then submit a reimbursement claim to Medicare or Medicaid for the provided equipment.

Miller admitted to submitting false and fraudulent claims to Medicare and Medicaid for power wheelchairs and power scooters that were either never supplied or more costly than the equipment actually supplied to beneficiaries. Her scheme was assisted by a physician, Dr. Walter Long, who provided pre-authorized CMNs that lacked patient information. Miller or her employees would complete the CMNs with names and information from Medicare and Medicaid patients, none of whom had an actual certified need for a wheelchair or scooter. Miller also admitted to fraudulently billing Medicaid for psychotherapy counseling services, despite the fact that she was not a licensed counselor.

Miller was charged by a thirty-count indictment and pled guilty to two counts: conspiracy to commit health care fraud, and conducting a financial transaction with criminally derived property valued at over $10,000. In a plea agreement, she and the government stipulated to a loss amount of $1.283 million.

In preparing the presentence report (PSR), the probation officer grouped the two offenses pursuant to U.S.S.G. § 3D1.2, and after considering the intended loss amount, calculated a base offense level of twenty-two. The probation officer also recommended the following enhancements: (1) a four-level increase under U.S.S.G. § 3B1.1(a) based on Miller's role as an organizer or leader of criminal activity; (2) a two-level increase under § 3B1.3 for abuse of a

No. 09-40438

position of trust in a manner that significantly facilitated the offense; and (3) a two-level increase under § 3C1.1 for obstruction of justice. The probation officer also recommended denying a reduction for acceptance of responsibility. Miller objected to each of the PSR's recommendations.

Over Miller's objection, the district court applied all three enhancements, but granted a two-level downward adjustment for acceptance of responsibility. The total offense level of twenty-eight, in light of Miller's criminal history category of III, resulted in an advisory guidelines sentencing range of ninety-seven to 121 months. The district court sentenced Miller to ninety-seven months' imprisonment and ordered restitution in the amount of $1.18 million.[1] It imposed no fine. Miller timely appealed the sentencing enhancements for abuse of a position of trust and obstruction of justice.

## STANDARD OF REVIEW

"This court reviews de novo the district court's guidelines interpretations and reviews for clear error the district court's findings of fact." *United States v. Le*, 512 F.3d 128, 134 (5th Cir. 2007). "The district court's application of section 3B1.3 is a sophisticated factual determination that we review for clear error." *United States v. Burke*, 431 F.3d 883, 889 (5th Cir. 2005); *see also United States v. Dial*, 542 F.3d 1059, 1060 (5th Cir. 2008) (per curiam) (resolving an intra-circuit split over the proper standard of review for § 3B1.3 enhancements). For an obstruction of justice enhancement, we likewise review the district court's factual findings for clear error. *United States v. Mann*, 493 F.3d 484, 498 (5th Cir. 2007). "A ruling that those findings permit an obstruction-of-justice enhancement is a question of law, reviewed *de novo*." *United States v. Brown*, 470 F.3d 1091, 1094 (5th Cir. 2006). "Under the clearly erroneous standard, we will uphold a finding so long as it is plausible in light of the record as a whole."

---

[1] The court utilized the stipulated restitution amount, less a credit for pending payments.

*United States v. Ekanem*, 555 F.3d 172, 175 (5th Cir. 2009) (quotation omitted). "However, a finding will be deemed clearly erroneous if, based on the record as a whole, we are left with the definite and firm conviction that a mistake has been committed." *Id.* (quotation omitted).

## DISCUSSION

Miller challenges the district court's application of the enhancements for abuse of a position of trust and obstruction of justice. We take her arguments in turn.

## I.    Abuse of a Position of Trust

Section 3B1.3 may be applied to increase a defendant's offense level by two "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. This court applies a two-part test to determine whether there has been an abuse of trust: "(1) whether the defendant occupies a position of trust and (2) whether the defendant abused her position in a manner that significantly facilitated the commission or concealment of the offense." *United States v. Kay*, 513 F.3d 432, 459 (5th Cir. 2007) (quotation omitted).

## A.    Position of Trust

Application note 1 to § 3B1.3 states that a position of trust is "characterized by professional or managerial discretion," and that individuals in such positions "are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." U.S.S.G. § 3B1.3 cmt. n.1.[2] The ability to exercise such professional or managerial

---

[2] Commentary contained in U.S.S.G. application notes is "authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *United States v. Johnston*, 559 F.3d 292, 295 n.4 (5th Cir. 2009) (quoting *Stinson v. United States*, 508 U.S. 36, 38 (1993)) (internal quotation marks omitted).

discretion is the "signature characteristic" of one who holds a position of trust. *United States v. Ollison*, 555 F.3d 152, 166 n.9 (5th Cir. 2009). Miller argues that she did not occupy a position of trust because she was merely an ordinary vendor in an arm's length commercial relationship with the government. She contends that under the structure of the Medicare and Medicaid programs, the government's trust is placed in physicians who provide CMNs and not in DME providers. The government counters that Medicare and Medicaid place substantial trust in DME providers, as evinced by witness testimony at the sentencing hearing. It further argues that circuit precedent applying § 3B1.3 to Medicare service providers compels affirmance.

A § 3B1.3 enhancement was upheld in *United States v. Iloani* against a chiropractor who had conspired with his patients to submit fraudulent claims to private insurance companies for treatments that were never rendered. 143 F.3d 921, 922-23 (5th Cir. 1998). We reasoned that "insurance companies usually rely on the honesty and integrity of physicians in their medical findings, diagnoses, and prescriptions for treatment or medication," and that "insurance companies must rely on physicians' representations that the treatments for which the companies are billed were in fact performed." *Id.* at 923. In *United States v. Gieger*, the defendants, operators of a Medicare-licensed ambulance company, defrauded the government by billing for the transport of patients who were improperly claimed to be bed-confined. 190 F.3d 661, 663 (5th Cir. 1999). This court held that *Iloani* barred the defendants' attempt to overcome a § 3B1.3 enhancement, reasoning that "the defendants carried out their fraud by abusing a similar position of trust [to Iloani's] with medical insurers." *Id.* at 665.

Miller seeks to distinguish herself from the ambulance operators in *Gieger* by arguing that the latter enjoyed considerable discretion, without physician oversight, to determine whether patients were ambulatory, whereas she, as a DME provider, could not provide any equipment without a CMN. We reject her

No. 09-40438

argument, for two reasons.  First, Miller effectively exercised the discretion that the Medicare and Medicaid programs entrust to physicians by knowingly completing CMNs for patients who had no need for the equipment provided. There was evidence that Miller obtained a set of pre-authorized, blank CMNs from Dr. Long and simply filled in patient names as they became known to her. Under the scheme she devised, Miller assumed the position of the certifying physician, and, like the *Gieger* defendants, she made the key decision whether a particular patient had a medical need for a wheelchair or scooter.

Second, as the owner of AA Better Medical Supply, Miller exercised substantial managerial discretion, which the guidelines recognize as an independent basis for occupying a position of trust.  *See* U.S.S.G. § 3B1.3 cmt. n.1. The PSR indicated that Miller directed and oversaw the business operations at both her company and a related company.[3]  She specifically instructed an employee to complete pre-authorized CMNs with patient information, and she provided cash or gifts to individuals in exchange for patient referrals from those individuals.  At the sentencing hearing, a Texas official charged with administering the Medicaid program for the State testified that the program trusted providers "to be honest in their billings" because the State lacks the resources necessary to monitor all submitted claims.  The official further testified that, from the government's perspective, a physician's word on a claim submission is no more valuable than a DME provider's word.  Meanwhile, Miller herself testified that she knew that both Medicare and Medicaid would assume the truthfulness of information contained in her claim submissions.  It is clear from this testimony that in providing medical benefits, Medicare and Medicaid

---

[3] As our opinion filed today in *United States v. Hawkins*, No. 09-40427, describes, the criminal scheme involved Miller and her company, as well as Miller's sister, Dorothy Ann Hawkins, and the company owned by Hawkins, Genesis Medical Supply.

rely not only on the truthfulness of physicians but also on the truthfulness of other vendors, including DME providers such as Miller.

Miller's position and authority as owner of a licensed DME provider "'involve[d] the type of complex, situation-specific decisionmaking that is given considerable deference precisely because it cannot be dictated entirely by, or monitored against, established protocol.'" *Ollison*, 555 F.3d at 167 (quoting *United States v. Tiojanco*, 286 F.3d 1019, 1021 (7th Cir. 2002)). Here, the established protocol of the government insurance programs depended upon the honesty and forthrightness of the DME provider in its claim submissions. By granting Miller a license to provide durable medical equipment, the government entrusted her to provide good faith, accurate information in seeking reimbursement from Medicare and Medicaid. Miller's success in exploiting the lack of government monitoring vividly demonstrates that her position "provide[d] the freedom to commit a difficult-to-detect wrong," which is the "primary trait" of one who holds a position of trust. *United States v. Brown*, 7 F.3d 1155, 1161 (5th Cir. 1993) (quoting *United States v. Hill*, 915 F.2d 502, 506 (9th Cir. 1990) (internal quotation marks omitted).[4]

---

[4] Miller's citation of cases from our sister circuits is not availing. She cites, for example, *United States v. Hayes*, in which the Eighth Circuit reversed the enhancement of a defendant who submitted false Medicaid claims on behalf of a home care provider. 574 F.3d 460, 481 (8th Cir. 2009). The *Hayes* court recognized that the Fifth Circuit, along with "the majority of our sister circuits that have addressed the question have held that health care providers who defraud Medicaid or Medicare may be subject to the abuse-of-trust enhancement." *Id.* at 480 (citing *Gieger*, 190 F.3d at 663, 665). It pointed out the Eleventh Circuit's outlier position holding that, "as a matter of law, a Medicaid-funded health care provider does not occupy a position of trust vis-à-vis Medicaid." *Id.*; *see United States v. Williams*, 527 F.3d 1235, 1251 (11th Cir. 2008) ("It could not have been intended that § 3B1.3 apply in every case where the defendant receives pecuniary gain by lying to the government."). But the Eighth Circuit explicitly *rejected* that position, and instead held that "an employee of a Medicaid-funded . . . provider . . . may occupy a position of trust." *Hayes*, 574 F.3d at 481.

## B.     Facilitation of the Offense

As for the second element of the enhancement, we ask "whether the defendant occupied a superior position, relative to all people in a position to commit the offense, as a result of her job." *Kay*, 513 F.3d at 459 (quotation omitted).  Miller offers no argument that her position did not facilitate the commission of the offense; nor could she, since it was her position as the owner of a DME provider that enabled her to defraud the government insurance programs with such ease.  The district court's application of the § 3B1.3 enhancement for abuse of a position of trust is affirmed.

## II.     Obstruction of Justice

During the presentence investigation, Miller omitted two pieces of information from her personal financial statement.  Specifically, Miller failed to disclose that she had previously filed for bankruptcy and that during 2005 and 2006 she earned between $4,500 and $5,500 per month as a hairstylist.  Based on these omissions, the district court applied a two-level sentencing enhancement for obstruction of justice under U.S.S.G. § 3C1.1.  Section 3C1.1 provides:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by **2** levels.

Miller argues that the enhancement was erroneously applied because the district court made no finding of willful obstruction, and because the omitted information was not material to sentencing.

No. 09-40438

We can reject Miller's latter argument because, for § 3C1.1 purposes, "material" information is that which "if believed, would *tend to* influence or affect the issue under determination." U.S.S.G. § 3C1.1 cmt. n.6 (emphasis added). Although the omitted financial data may not have had any actual effect on Miller's fine or restitution amounts, it is certainly the kind of information which would "tend to influence" those determinations. *See, e.g.*, *United States v. Dupre*, 117 F.3d 810, 825 (5th Cir. 1997) ("A statement to a probation officer concerning one's financial resources will obviously affect the officer's determination of ability to pay." (quotation omitted)). There is no basis to deem the omitted information not material when it did not have, but was the kind of information which could have had, an influence on the relevant sentencing determinations. *See United States v. Juarez-Duarte*, 513 F.3d 204, 210-11 (5th Cir. 2008) (recognizing the applicability of the obstruction enhancement in either scenario).

Miller also contends that her errors were the result of confusion and mistake, and did not amount to a willful obstruction of justice. She argues that the district court, which expressly acknowledged her confusion, applied the enhancement for statements that were merely incorrect, without making the requisite *mens rea* finding. To support the enhancement, the court stated:

> There was some confusion that has been mentioned through testimony about Ms. Miller's understanding of what she thought she was supposed to do, compared to what Probation was going to do in listing some of this information. But I think that there is sufficient evidence here, confirmed by testimony, that the obstruction should apply. There was no doubt some incorrect information provided. The bankruptcy omission, the other job. I find those items to be material and relevant to the amount of fine or restitution that could be paid. So I think that the obstruction of justice is correct—the obstruction of justice enhancement is correct.

9

No. 09-40438

Application note 2 to § 3C1.1 states that "the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." U.S.S.G. § 3C1.1 cmt. n.2. We have counseled district courts to "carefully consider whether the defendant has engaged in [obstructive] behavior in a conscious and deliberate attempt to obstruct or impede the administration of justice." *United States v. Greer*, 158 F.3d 228, 239 (5th Cir. 1998).

We also find instructive the Supreme Court's decision in *United States v. Dunnigan*. In that case, the Court addressed an obstruction enhancement in a related context—when the defendant has allegedly perjured herself through trial testimony. 507 U.S. 87 (1993). It stated:

> [I]f a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out. When doing so, it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding. The district court's determination that enhancement is required is sufficient, however, if, as was the case here, the court makes a finding of an obstruction of, or impediment to, justice that encompasses all of the factual predicates for a finding of perjury.

*Id.* at 95 (citations omitted); *id.* at 94 (defining perjury as "false testimony concerning a material matter *with the willful intent* to provide false testimony, rather than as a result of confusion, mistake, or faulty memory" (emphasis added)). Although *Dunnigan* addressed trial testimony, rather than statements given during a presentence investigation, the principle it sets forth—that a

10

district court should make "independent findings" to establish a willful obstruction—is relevant.

The district court's findings in this case do not include an explicit finding of willfulness—and they need not. *See, e.g.*, *id.* at 95; *see also United States v. Como*, 53 F.3d 87, 89 (5th Cir. 1995) (affirming an obstruction-of-justice enhancement where the district judge expressed a belief that the defendant "was [not] totally candid and truthful"). But neither do they appear to encompass the factual predicates of a willful false statement. The only finding arguably relevant to willfulness is that there was "some incorrect information provided." That some information was "incorrect" does not mean that Miller knew the correct information and intentionally withheld it in an attempt to frustrate the investigation.

Furthermore, the court here made an affirmative finding of "some confusion" on Miller's part, which is precisely the situation that application note 2 warns against. U.S.S.G. § 3C1.1 cmt. n.2 ("[T]he court should be cognizant that inaccurate . . . statements sometimes may result from confusion . . . ."). That the district court found Miller to have been confused about "what she was supposed to do" renders us unable to discern whether it affirmatively found her to have acted willfully. Lacking certainty on the present record that the district court actually found Miller to have willfully omitted information, we must vacate the enhancement and remand the case for resentencing. In its discretion, the district court may opt to further develop the record on remand.

### CONCLUSION

For the foregoing reasons, the enhancement for abuse of a position of trust is AFFIRMED, the enhancement for obstruction of justice is VACATED, and the case is REMANDED for resentencing.

No. 09-40438

Garwood, specially concurring.

I concur in the result. I join in that portion of the opinion dealing with obstruction of justice. I also join in most of the opinion respecting abuse of position of trust. The undisputed evidence shows as a matter of law that Miller fraudulently represented that the medical certificates of necessity were genuine, when in fact they were fraudulent as she well knew and were fraudulently provided to Miller by the doctor signing them. I believe this is sufficiently analogous to the situations described in application note 3 to § 3B1.3 U.S.S.G. to warrant application of this enhancement. I would not go beyond that.[*****]

---

[*****] The evidence shows that due to the volume of claims Texas Medicaid makes no investigation or specific reliance with respect to any of these claims, but simply pays them if they are facially in order. That is essentially all that the Medicaid representative's testimony shows. But the Medicaid system *does* require that there be a physician's certificate of medical need. No such judgment by the provider is called for. *USA v. Gieger*, 190 F.3d 661 (5th Cir. 1999), is not in point. It involved a situation where the regulations did *not* call for a certificate by a physician, and the ambulance company had its paramedics and emergency medical technicians certify (fraudulently) that the patients were not ambulatory.

12